FILED '07 JUN 20 16:07USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| RAPID DISPLAYS, INC., an Illinois corporation, | ) ) ) | Civil No. 02-252-JE |
| Plaintiff, | ) ) ) | |
| v. | ) ) | SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| RAY L. GORDER, individually; PAMELA K. GORDER, individually; IMAGINATION/FABRICATION, INC., an Oregon corporation; and GORDER PROPERTIES, L.L.C., an Oregon limited liability company, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Linda Johannsen
Preston Gates & Ellis LLP
222 S.W. Columbia Street, Suite 1400
Portland, OR 97201-6632

William Gantz
Piper Rudnick
203 North LaSalle Street, Suite 1800
Chicago, IL 60601-4000

        Attorneys for Plaintiffs

David J. Sweeney
Angela M. Russell
Brownstein, Rask, Sweeney, Kerr, Grim,

Supplemental Findings of Fact
and Conclusions of Law - 1

DeSylvia & Hay, LLP
1200 S.W. Main
Portland, OR 97205

Attorneys for Defendants

JELDERKS, Magistrate Judge:

Plaintiff Rapid Displays, Inc. (Rapid) brought this action against defendants Ray L. Gorder, Pamela K. Gorder, Imagination/Fabrication, Inc. (IF), and Gorder Properties, L.L.C. In an earlier related action, Rapid obtained a stipulated judgment against Interesting Exhibits (IE) in the amount of $282,516.46. Rapid brought the present action when it was unable to collect the judgment from IE.

Following a trial to the court, I issued my Findings of Fact and Conclusions of Law, pursuant to Fed. R. Civ. P. 52(a), on February 13, 2004. In that decision, I determined that plaintiff was entitled to recover $30,891.41 from defendant Ray Gorder only. I found in favor of the other defendants, and concluded that Rapid was not entitled to an award of attorney fees or punitive damages.

In a decision filed on November 30, 2005, and amended on January 23, 2006, the Ninth Circuit Court of Appeals reversed the damages award in part, affirmed in part, and remanded for recalculation of damages.

In an Order filed on August 6, 2006, I summarized the Ninth Circuit's conclusions and holdings in this action that are particularly significant on remand, and set out my

Supplemental Findings of Fact
and Conclusions of Law - 2

understanding of the issues that the Ninth Circuit instructed
this court to resolve on remand.  The parties were instructed
to inform the court if there was disagreement as to that
summary.  Neither party objected to the court's
characterization of the issues.

Following the parties' submission of additional briefing
on the issues presented on remand, and receipt of additional
exhibits from defendant Gorder, oral argument concerning the
issues on remand was held on March 21, 2007.

As the Ninth Circuit Court of Appeals noted in its
decision, the parties are familiar with the facts, and the
facts need not be recited in detail.  This Supplemental
Findings of Fact and Conclusions of Law will therefore address
only those questions that the Court of Appeals instructed the
court to resolve on remand.


A. Comments guiding this court's examination of the remaining
issues

Three comments by the Court of Appeals are of particular
significance on remand, and have guided this court in
addressing the specific questions posed by that court.  First,
the Court of Appeals concluded that I had erred in accepting
defendant Gorder's assertion that IE owed him "hundreds of
thousands of dollars in virtually undocumented 'loans' which
Gorder 'issued' to help keep IE financially afloat."

Supplemental Findings of Fact
and Conclusions of Law - 3

Rapid Displays, Inc. v. Gorder, 155 Fed.Appx. 962, 964
(9th Cir. 2005).  The Court of Appeals observed that "Oregon
deems a loan from a shareholder to the corporation in which he
owns shares to be a capital contribution 'if it is made . . .
when no other disinterested lender would have extended
credit.'"  Id. at 965 (quoting Houston's, Inc. v. Hill, 111
Or. App. 502, 826 P.2d 644, 646-47 (Or. App. 1992)).  The
Court of Appeals further observed that, because Gorder was
IE's sole shareholder, his transactions with that corporation
are subject to strict scrutiny, and will be set aside in
equity unless he sustains his burden of establishing that they
were part of an "arms-length bargain."  Id.  (quoting
Houston's, 826 P.2d at 647).

        These observations are important, because I had concluded
that all of Gorder's substantial transfers of funds to IE were
fairly characterized as loans, and that Gorder was entitled to
be treated as any other unsecured creditor upon IE's
liquidation, despite the absence of records showing the kind
of anticipated repayment schedules and interest charges
normally associated with true loans made as part of an
"arms-length bargain."  The defendants' failure to produce a
document referred to at trial as the "Ray Loan File" is
relevant to this issue.  Despite Rapid's repeated requests,
this document and a "tan checkbook" referred to a number of
times at trial, were never produced.  From trial testimony, it

Supplemental Findings of Fact
and Conclusions of Law - 4

appears that these documents would have provided evidence concerning certain of Gorder's transactions with IE that have not been recharacterized as contributions of capital below. In the absence of the kind of documents and records normally created when business loans are made, or evidence that there was any interest charged or repayment schedule applied, Gorder cannot meet his burden of establishing that the flow of funds between himself and IE were made as part of any "arms length transactions."

Because Gorder cannot establish that the transfers he made to IE were carried out through "arms length transactions," he cannot establish that the transfers for which he contends he was entitled to compensation upon IE's liquidation were truly loans. This is significant because the Ninth Circuit has instructed that transactions that were not "arms length" must be set aside in equity. Because Gorder's transfers to IE were not loans, they must have been infusions of capital. This is important, because to the extent Gorder's transfers to IE were capital contributions and not loans, Gorder was not entitled to a pro rata share of IE's assets as an unsecured creditor when IE was liquidated. To the extent that Gorder was not a creditor, more funds should have been available for other unsecured creditors like Rapid when IE was liquidated.

Supplemental Findings of Fact
and Conclusions of Law - 5

In responding below to the Ninth Circuit's specific questions, I have generally accepted Gorder's characterization of his transfers to IE before May 24, 2000, as "loans," because it appears that those questions require that these earlier transfers be construed as loans.  As discussed below, even with that assumption I have concluded that, with the appropriate adjustments, IE should have had sufficient funds to pay its debt to Rapid upon liquidation.  If the transfers that Gorder made to IE before 2000 are characterized as capital contributions rather than loans, IE owed Gorder nothing as an unsecured creditor when IE was liquidated, and should have had even more assets available to pay creditors such as Rapid.

The second comment by the Court of Appeals relates to Gorder's purported "loan" of $168,141.71 to IE on May 9, 2001. The Court of Appeals held that, because "no other disinterested lender would have extended credit to IE on May 9, 2001 . . . [that 'loan'] was actually a capital contribution." Id.  This of course means that IE owed Gorder, as a creditor, at least $168,141.71 less than I had previously calculated in my Findings of Fact and Conclusions of Law, and the amount of IE's unsecured debt and the amount it owed to Gorder at the time of its liquidation must be reduced by that amount.  IE's creditors were entitled to be paid before any of this amount was repaid to Gorder because, as the Court of

Appeals noted, "creditors receive priority over shareholders in the distribution of a corporation's assets upon its dissolution." Id. (citing Or. Rev. Stat. § 60.637).

Finally, in affirming my finding that IE's corporate form should not be disregarded, the Court of Appeals observed that it "need not consider the extreme remedy of piercing the corporate veil because Rapid is likely to receive adequate, if not full, satisfaction of its claims under the alternative theories of recovery discussed [in this opinion]." Id. at 967. It is apparent that the Court of Appeals concluded that, on remand, Rapid should receive a substantially larger recovery than was provided for in my earlier decision.


B. Instructions on remand

1. Determine the date between May 24, 2000, and May 9, 2001, when a disinterested lender would no longer have extended credit to defendant IE. Subtract any amounts defendant Gorder claims to have loaned to IE after that date from the total amount that IE owed Gorder as a creditor.

The Court of Appeals concluded that Rapid was a "disinterested lender extending credit to IE when it agreed to defer two thirds of the amount due under its invoice on May 24, 2000," and that "no other disinterested lender would have extended credit to IE on May 9, 2001," the date on which Gorder transferred $168,141.71 to that corporation. Id. at

Supplemental Findings of Fact
and Conclusions of Law - 7

965. Though I had found that Gorder was aware that IE was in
"financial peril" by the end of 2000 or early 2001, I had not
determined precisely when a disinterested lender would no
longer have extended credit to IE.

Because "loans" from a shareholder to a corporation made
when no disinterested lender would extend credit are deemed
"contributions of capital" under Oregon law, the Court of
Appeals instructed this court on remand to "determine the date
between May 24, 2000 and May 9, 2001 when a disinterested
lender would no longer have extended credit to IE . . . ."
Id. The Court of Appeals further instructed this court to
"subtract any amounts Gorder claims to have loaned to IE after
such date from the total IE owed Gorder as a creditor."

Based upon further review of the record, I find that the
date upon which a disinterested lender who was accurately
apprised of IE's financial condition would no longer have
extended credit to defendant IE is May 25, 2000. As noted in
my earlier decision, IE subcontracted work to plaintiff Rapid
under an agreement concluded on May 24, 2000. IE paid Rapid
$134,166.66 at that time, which was 1/3 of the contract price,
and agreed to pay Rapid the balance of the $405,500 contract
price when the displays were delivered. According to
financial information that IE provided Rapid in May 2000, IE
already had a negative net worth of $407,521.69 as of May 4,
2000. Its financial situation was considerably more

Supplemental Findings of Fact
and Conclusions of Law - 8

precarious after it agreed to pay Rapid approximately $134,000 a few weeks later, and incurred the obligation to pay Rapid approximately $268,000 after the displays were delivered.  In addition, IE's financial situation was more precarious than Rapid had been led to believe, because IE had fewer assets that could be reached in case of default than had been represented.  As noted in my earlier decision, Gorder and IE subsequently took the position that interests in a boat and beach house valued as assets of IE worth approximately $103,000 in fact belonged to Gorder, and not to IE, and removed these as assets from IE's records.  Given the already very precarious financial position of IE before May 24, 2000, a disinterested lender who was accurately apprised of IE's true financial situation would not have extended credit to that corporation the next day.

Gorder contends that, because a number of vendors continued to extend credit to IE up to the time it was liquidated, the court should find that the date on which a disinterested lender would no longer have extended credit to IE was May 8, 2001.  I disagree for two reasons.  First, I interpret the term "lender" in the Court of Appeals first question to refer to a "lender" in the usual meaning of that term, which is one who would be willing to provide a monetary loan to IE without Gorder's personal guarantee.  Second, even if "disinterested lender" refers to one who provides trade

Supplemental Findings of Fact
and Conclusions of Law - 9

credit, the Court of Appeals' question must refer to a reasonable hypothetical lender who is provided with accurate information as to IE's financial condition.  On the record before the court, I conclude that no reasonable individual or entity fully and accurately apprised of IE's financial condition would have loaned money or provided additional credit to IE in an arms-length transaction after May 24, 2000.

Any funds that Gorder infused into IE after May 24, 2000, must be characterized as contributions of capital, and not as unsecured loans.  Therefore, I next must subtract any amounts Gorder claimed to have "loaned" to IE after that date from the amount that IE was previously found to have owed him as a creditor.

In my earlier decision, I noted that defendants asserted that Gorder had loaned IE $69,040.00 in 2000, and that the record included copies of checks in the amount of $148,250.00 that Gorder had written to IE between January 1, 2001, and May 9, 2001.  Trial exhibits 1012-00-1 through 1012-00-12 show that $12,000 of the amount Gorder transferred to IE in 2000 was paid to IE after May 24, 2000.  That amount, the $148,250.00 "loaned" between January 1 and May 9, 2001, and the $168,141.71 that Gorder transferred to IE on May 9, 2001, must be subtracted from the amount that IE owed Gorder as an unsecured creditor.  This reduces the amount that IE owed Gorder as a creditor by $328,391.71.

Supplemental Findings of Fact
and Conclusions of Law - 10

In my earlier decision, I found that, when IE went out of business, IE owed Gorder $394,798.62.  In accordance with the Court of Appeals' direction, $328,391.71 is now subtracted from that total, and, as explained at page 20 below, $122,388.96 is added back into the amount owed Gorder.  This reduces IE's debt to Gorder as an unsecured creditor to $188,795.87.

2. Determine the date when defendant Gorder had a "reasonable belief" that IE was "probably insolvent," and as a result was required to discontinue business

The Court of Appeals noted that, though I found that Gorder knew IE was insolvent by May 10, 2001, and "suggest[ed] such knowledge may have come as early as the end of 2000 or early 2001," I did not make a finding as to when Gorder first knew that IE was "'probably insolvent' under the Gantenbein 'trust fund' doctrine." Id. at 965.  The Court of Appeals affirmed this court's reliance on Gantenbein as the source of the controlling legal precedent, and instructed this court, on remand "to determine the date when Gorder first had a 'reasonable belief' that IE was 'probably insolvent' and therefore 'must discontinue business . . . .'" Id. at 966 (quoting Gantenbein v. Bowles, 103 Or. 277, 290, 203 P. 614, 619 (1922)).  In addition, the Court of Appeals instructed this court to "calculate both (i) IE's total assets that

Supplemental Findings of Fact
and Conclusions of Law - 11

should have been held in trust on behalf of its creditors and (ii) IE's total indebtedness (to both secured and unsecured creditors) as of that date." Id. at 966.

In determining the date upon which Gorder's knowledge of IE's insolvency required Gorder, as IE's sole shareholder, to discontinue IE's business and hold IE's remaining assets in trust for the benefit of its creditors, the following excerpt of the Court of Appeals' decision is particularly helpful:

> Directors of an insolvent Oregon corporation have a fiduciary duty to "hold the assets of the corporation as a trust fund for equal distribution among creditors . . . whenever the fact that it must discontinue business by reason of the insolvency comes to their knowledge." Gantenbein v. Bowles, 103 Or. 277, 203 P.614, 619 (1922).  "[T]hey cannot use those assets to prefer themselves as creditors . . . to the prejudice of general creditors." *Id.*

From this reference, it is clear that the Gantenbein Court's principal concern was that corporate directors who had invested in a corporation not give preference to their own interests over those of other creditors when a corporation fails.  To prevent this unfairness, such investor/creditors are generally required to halt a corporation's operations and hold the assets of the corporation in trust for all creditors when they know that the corporation likely will not be able to continue in business.  The Gantenbein Court stated that the "trust fund rule attaches" and that "directors lose power to prefer themselves" when they "have voted the corporation to be insolvent" and "whenever the fact that it must discontinue

Supplemental Findings of Fact
and Conclusions of Law - 12

business by reason of the insolvency comes to their knowledge." Gantenbein, 103 Or at 290, 203 P. at 619.

Though the "trust fund" doctrine clearly requires that corporate directors generally discontinue a corporation's operations upon insolvency, the present action presents unusual circumstances that differ significantly from those presented in Gantenbein. Here, though IE was insolvent long before it was dissolved, the unfairness that the "trust fund doctrine" seeks to avoid did not arise so long as Gorder infused substantial sums, now characterized as "capital contributions," into the corporation. As noted in the above section, all Gorder's cash infusions into IE after May 24, 2000, are properly characterized not as loans, but as contributions of capital. Because Gorder did not acquire the status of a creditor as to these contributions, the other unsecured creditors were in no way prejudiced by these post-insolvency investments. Instead, many other creditors benefitted because Gorder's capital contributions allowed IE to continue to pay many of its obligations that otherwise would have been defaulted, and because the contributions added to IE's assets that would be available when IE was ultimately dissolved.

Under these circumstances, I conclude that the date upon which IE became insolvent and the date, under the trust fund doctrine, when IE was required to discontinue its business and

hold its assets in trust for the creditors, are not the same. This conclusion is based upon the guidance of the Gantenbien Court, which emphasized that application of the "trust fund doctrine" required "reference to the company's affairs." Id. at 290.  Here, that examination supports the conclusion that, though IE had been technically insolvent for some time before its liquidation, it would continue to meet its financial obligations as long as Gorder made the capital contributions that allowed it to do so.

I also conclude that Gorder had a "reasonable belief" that IE was "probably insolvent" by January 1, 2000, nearly five months before IE entered into the agreement with Rapid giving rise to this action.  The financial records that IE furnished Rapid in May of 2000 showed that IE had a negative net worth of $407,521.69.  Gorder was required to periodically transfer his own funds to IE in what are now characterized as capital contributions so that IE could meet its financial obligations.  IE lost two major clients, Speedo and Louisiana Pacific, in 1999, and by the spring of 2000 Gorder knew that a substantial Greens.com receivable was not collectible.  Under these circumstances, it is reasonable to conclude that Gorder knew that IE was probably insolvent by January 1, 2000.

Nevertheless, the date upon which Gorder was required to discontinue IE's business and hold IE's assets in trust for its creditors was the date upon which Gorder was no longer

Supplemental Findings of Fact
and Conclusions of Law - 14

willing to make the substantial capital contributions needed for the business to survive. As long as Gorder made substantial capital contributions, IE's continuing operations did not harm its creditors, but instead increased the possibility that they would be repaid.

The record establishes that Gorder did not make further capital contributions after May 9, 2001, and that IE ceased its operations and shut down in July, 2001. Based upon this record, I find that Gorder was required to cease IE's operations and hold IE's assets in trust for its creditors in July, 2001, because at that time Gorder decided to stop making the capital contributions required to keep IE in business.

3. Calculate IE's assets and indebtedness as of the date that IE was required to discontinue business because of Gorder's belief that it was probably insolvent

As noted above, the Court of Appeals has instructed this court to determine the value of IE's assets that should have been held in trust for the benefit of its creditors and the amount of IE's secured and unsecured debt as of the date that its indebtedness required discontinuance of its business. Unfortunately, the state of IE's financial records does not permit calculation of these figures with complete confidence as of July, 2001. However, it appears that, with the adjustments required by the calculations set out in Section 1

Supplemental Findings of Fact
and Conclusions of Law - 15

above, the calculations for the time of the liquidation set out in the earlier decision come as close as possible to determining those amounts.  In my earlier decision, I found that a total of $188,506.48 should have been available for IE's creditors at the time of the liquidation.  I also found that IE owed Gorder $394,798.62, owed Rapid $282,516.46, owed other unsecured creditors $208,799.42, and owed KeyBank, a secured creditor, $47,532.72.  Based on the recalculation of the amount owed Gorder required under Section 1 above, IE owed Gorder $188,795.87 at the time of the liquidation.  The other debt calculations remain the same.

    If other considerations raised by the questions posed by the Court of Appeals on remand did not affect the calculations, at the time when it was required to cease operations, IE should have had $188,506.48 available for its creditors.  IE's debt to its unsecured creditors, including Gorder ($188,795.87), Rapid ($282,516.46), and others ($208,799.42), was $680,111.75.  Its secured debt was $47,532.72, and its total debt was $727,644.57.  However, based upon the analysis required by the Court of Appeals' fourth and fifth questions, set out below, the amount that should have been available to creditors at the time of IE's liquidation must be increased by $250,292.00, the amount that Gorder's purported "loans" to IE were decreased during 2000. For the reasons discussed below, any transfers from IE to

Supplemental Findings of Fact
and Conclusions of Law - 16

Gorder as evidenced by a reduction in the amount IE owed to him constituted an improper shareholder distribution, and deprived IE of assets that should have been available to pay its creditors upon liquidation.

With the addition of this amount, IE should have had $438,798.48 available to pay its unsecured creditors, including Gorder and Rapid, and its secured creditor, KeyBank. In addition to this amount, as noted in the answer to question 4 below, IE should have had the $122,388.96 in payments it made related to the boat and beach house, certain payments to Edna Shaw, and "row house" expenses because those transactions constituted constructive fraud. With the addition of this amount, IE should have had $561,187.44 available to pay its creditors at the time of its liquidation.

Rapid had already asserted a legal claim to recover IE's debt to it by the time IE was liquidated. Because no other unsecured creditors ever asserted a legal claim to IE's assets, at the time of its liquidation, IE should have had enough assets to pay the full amount of the stipulated judgment in the amount of $282,516.46 entered in the earlier action Rapid brought in this court, to repay the $188,795.87 it owed to Gorder, and to pay the $47,532.72 it owed to KeyBank.

In my earlier decision, I apportioned what I calculated should have been the value of IE's assets at liquidation among

Supplemental Findings of Fact
and Conclusions of Law - 17

all secured and unsecured creditors.  However, I now conclude
that, because there is no evidence that any other unsecured
creditors made any claims against IE following its
liquidation, it is only fair to consider Gorder and Rapid as
the only interested unsecured creditors.  After subtracting
the $47,532.72 that IE owed its secured creditor from the
$561,187.44 that IE should have had available to pay all
creditors, IE should have had $513,654.72 available to pay
Gorder and Rapid.  As noted above, IE owed Rapid $282,516.46
pursuant to a stipulated judgment, and owed Gorder
$188,795.87, for a total of $471,312.33.  This amount is
less than IE should have had available.[1]


4. Consider, pursuant to Or. Rev. Stat. § 95.230, potentially
fraudulent transfers that IE made both before and after
May 24, 2000

        The Court of Appeals noted that, in my earlier decision,
I made a number of what I considered "appropriate adjustments"

---

[1]If, as is impossible to verify from the record, $103,126.84
of the reduction of IE's "debt" to Gorder in 2000 was based upon
the "return" of the beach house and the boat to Gorder's account,
IE might not have had assets sufficient to pay both Rapid and
Gorder.  In any event, Gorder did not satisfy his burden, as a
sole shareholder, of establishing that his transactions with IE
regarding the beach house and the boat were part of an "arms-
length" transaction.  In the absence of reliable, verifiable
records concerning these assets, Gorder cannot establish that the
"return" of these assets was proper, and in a rapidly inflating
real estate market the beach house was likely worth more than the
book value.

Supplemental Findings of Fact
and Conclusions of Law - 18

to the amount IE asserted it owed Gorder, and found that Rapid had not established that Gorder had made fraudulent transfers. On remand, the Court of Appeals noted that "'Or. Rev. Stat. § 95.230 encompasses a debtor's transfers that are fraudulent as to a creditor, whether the creditor's claim arose *before or after* the transfer was made . . .' (emphasis added)." Rapid, 115 Fed. Appx. at 966. The Court of Appeals remanded "pursuant to Or. Rev. Stat. § 95.230 to provide the district court with the opportunity [to] consider potentially fraudulent transfers by IE both before *and* after May 24, 2000." Id. (emphasis in original). This inquiry ends with transfers made by July 2001, however, because the Court of Appeals concluded that Rapid had not shown that it would be entitled to greater relief under the Uniform Fraudulent Transfer Act (UFTA), Or. Rev. Stat. §§ 95.200-310, than under Gantenbein as to "post-July 2001 transfers." Id.

In order to establish its UFTA claim, Rapid must establish that some of IE's payments to Gorder or others before July 2001 were either made "with actual intent to hinder, delay, or defraud any creditor," or "constituted constructive fraud due to inadequate consideration for the property conveyed and the insolvency or near insolvency of the debtor." Id. (citing Doughty v. Birkholtz, 156 Or. App. 89, 964 P.2d 1108, 1112 (1998)).

Supplemental Findings of Fact
and Conclusions of Law - 19

In re-examining the record, I now conclude that some of
the "adjustments" I made to the amount IE owed Gorder
reflected constructively fraudulent transactions.
Specifically, these are the adjustments totaling $122,388.96
I made for accounting irregularities, expenses related to the
boat and beach house, payments to Edna Shaw, and "row house"
expenses.  These expenses were constructively fraudulent
because IE received little or no consideration in return for
the expenditures, and they were made at times when IE was
insolvent or nearly insolvent.  I also conclude that I erred
in reducing the amount IE owed Gorder by these amounts, rather
than adjusting the amount that should have been available to
pay creditors when IE was liquidated.  If IE had not
improperly paid these expenses for Gorder's benefit, an
additional $122,388.96 would have been available to pay IE's
creditors upon liquidation.  Accordingly, I included this
amount in calculating the value of IE's assets that should
have been available for that purpose in answering question 3
above.  Because this amount is now properly treated as if it
had not been paid out by IE, I can no longer also treat this
amount as being paid on Gorder's behalf.  Therefore, this
amount is now included in the amount IE owed Gorder.

Based upon a re-examination of the record, I also
conclude that Rapid has not established that most of the other
expenditures of which it complains were fraudulent.  However,

Supplemental Findings of Fact
and Conclusions of Law - 20

for the reasons discussed below in response to the Court of Appeals' fifth question, I do find that any purported repayments of "loans" to Gorder in 2000 and 2001 should be considered fraudulent transfers, because they constituted improper distributions to a shareholder when IE's assets were insufficient to cover its liabilities.

5. <u>Determine whether defendant Gorder paid himself dividends from IE in violation of Or. Rev. Stat. § 60.181(3)(b), and if so, whether such payments are relevant in determining whether the UFTA was violated</u>

The Court of Appeals concluded that, to the extent Gorder's cash transfers to IE were capital contributions, IE's repayments to Gorder should be recharacterized as dividends. <u>Id.</u> at 967. The Court of Appeals further stated that, under Or. Rev. Stat. § 60.181(3)(b), an Oregon corporation's remaining assets must at least equal its liabilities following a dividend distribution to shareholders. <u>Id.</u> As noted above, under a provision of the UFTA set out in Or. Rev. Stat. § 95.230(1)(b), a debtor's transfer of property for insufficient consideration at or near the time of insolvency may constitute constructive fraud. <u>Id</u> at 966. Citing this provision, the Court of Appeals noted that a dividend paid in violation of § 60.181(3)(b) "could be construed as a transfer" that was not supported by adequate consideration. <u>Id.</u> at 967

n. 5.  Accordingly, the Court of Appeals observed that, if
this court found that Gorder "paid himself dividends from IE"
when its assets did not equal its liabilities, such conduct
might be relevant in determining whether the transfers were
fraudulent under the UFTA.  Id. at 967.

     As the Court of Appeals noted, IE's tax returns showed
that IE's total liabilities exceeded its assets at the
beginning and end of 2000 and 2001.  As discussed in Section 1
above, the sums that Gorder transferred to IE after May 24,
2000, must be characterized not as loans, but as capital
contributions.  The return of those contributions accordingly
was not a loan repayment, but instead should be characterized
as payment of  dividends.  Because IE's assets did not equal
its liabilities following the distribution of these dividends,
these distributions violated Or. Rev. Stat. § 60.181(3)(b).
Given that IE could not lawfully make such distributions, and
was further impoverished by doing so, I conclude that any
payment of dividends to Gorder during 2000 and 2001
constituted a constructive fraudulent transfer within the
meaning of § 95.230(1)(b).  In transferring capital to Gorder
at a time when it was insolvent, IE gained nothing and
surrendered valuable assets, and was left with fewer assets to
pay its liabilities to its creditors.

     The record before the court does not permit a precise
determination of how funds were transferred from IE to Gorder

Supplemental Findings of Fact
and Conclusions of Law - 22

during 2000.  However, IE's tax records show that IE's debt
to Gorder was reduced by $250,292.00 during 2000.  In the
calculations above, that amount has been added to the total of
IE's assets that should have been available to pay creditors
when IE was liquidated.

6. Consider whether Rapid has a valid claim for attorney fees
under Oregon law

    As the Court of Appeals noted, though attorney fees are
generally not recoverable in the absence of a statute or
contractual provision authorizing an award of these fees,
Oregon does recognize that a court in equity has the inherent
power to award attorney fees.  Id. (citing Lewis v. Department
of Revenue, 294 Or. 139, 653 P.2d 1265, 1267 (1982).  The
Court of Appeals also noted that, though I had bifurcated the
liability and attorney fees portions of the trial, after trial
I issued my decision "without proceeding with an attorney's
fees . . . phase of trial."  Id. at 968.  On remand, it
instructed this court "to consider whether Rapid has any valid
claim for attorney's fees under Oregon law."  Id.

    Based upon my re-examination of this issue on remand, I
again conclude that Rapid is not entitled to recover attorney
fees under Oregon law.  Rapid does not dispute Gorder's
assertion that there is no statutory or contractual basis for
awarding attorney fees here.  It argues, instead, that it is

Supplemental Findings of Fact
and Conclusions of Law - 23

entitled to recover attorney fees on other grounds. Rapid first contends that Gorder's breach of a fiduciary duty in a business setting supports a claim for general damages that arise naturally from the breach, because its damages include the costs of bringing this action to impose a constructive trust on IE's assets. I disagree, because the attorney fees incurred in bringing an action are not "damages" in the action in which the fees are incurred. See, e.g., State v. O'Brien, 96 Or. App. 498, 505, 774 P.2d 1109, rev. denied, 308 Or. 466 (1989) (attorneys fees not considered damages in same action in which legal services are rendered).

Plaintiff cites Royal v. Royal, 30 Or. 448, 455, 47 P. 828, 830 (1897) in support of the conclusion that "litigation expenses" incurred in bringing an action based upon breach of a fiduciary duty are recoverable. In that action, the court awarded a prevailing beneficiary his costs and disbursements. However, attorneys fees are not generally considered as part of those expenses. See Or. R. Civ. P. 68(A)(2) (attorney fees not listed in types of "costs and disbursements" incurred in prosecuting or defending legal action).

Plaintiff cites Oksenholt v. Lederle Laboratories, 51 Or. App. 419, 428, 625 P.2d 1357, aff'd. as modified, 294 Or. 213, 656 P.2d 293 (1982), Osborne v. Hay, 284 Or. 133, 142, 585 P.2d 674 (1978), and Raymond v. Feldmann, 124 Or. App. 543,

Supplemental Findings of Fact
and Conclusions of Law - 24

546, 863 P.2d 1269 (1993) for the proposition that, under
Oregon law, a plaintiff may be entitled to recover expenses
incurred in defending or prosecuting a prior action, if a
defendant's tort required the plaintiff to protect his
interests in a subsequent legal action.  While not disputing
this proposition, Gorder correctly notes that plaintiff here
is not seeking to recover fees incurred in a prior action, but
instead is seeking to recover fees incurred in the present
action.  Accordingly, the cited decisions do not support the
conclusion that Rapid is entitled to recover attorney fees in
this action.

    Rapid cites Medford Irrigation Dist. v. Western Bank, 66
Or. App. 589, 597, 676 P.2d 329 (1984) and Swett v. Bradbury,
335 Or. 378, 381, 67 P.3d 391 (2003), in support of its
assertion that Oregon courts may award attorney fees based
upon equitable principles even if there is no other authority
for such an award.  However, these decisions do not support
the conclusion that Rapid should recover attorney fees in the
present action.  In Medford, unlike here, the plaintiff sought
to recover attorney fees incurred in creating a "common fund"
in which other beneficiaries would also share.  The Swett
court analyzed the availability of attorney fees for
plaintiffs who sought to vindicate important constitutional
rights that applied to all citizens, without any special gain
for the plaintiff.  Here, plaintiff neither sought to create

Supplemental Findings of Fact
and Conclusions of Law - 25

or preserve a common fund available for others as well as itself, nor sought to vindicate important constitutional principles.

Finally, Rapid cites <u>Dizick v. Umpqua Community College</u>, 287 Or. 303, 312, 599 P.2d 444 (1979) in support of the assertion that a court must apply a flexible measure of damages in a fraud action in order to adequately compensate the plaintiff for the loss he has suffered. Rapid contends that its losses would not have occurred but for Gorder's breaches of fiduciary duty and fraudulent conduct, and that it cannot be "made whole" without an award of fees. However, here, unlike <u>Dizick</u>, the plaintiff has not asserted a claim for common law fraud. In addition, as noted above, attorney fees are not an element of "damages" in this action.

In addition to asserting that the cited decision support an award of attorney fees here, Rapid originally argued that it was entitled to an award of attorney fees under Or. Rev. Stat. § 20.190. During the oral argument held on March 21, 2007, Rapid conceded that it is not entitled to recover attorney fees under that statute.

**CONCLUSION**

For the reasons set out above, on remand from the Court of Appeals, plaintiff Rapid is entitled to recover the full amount that it sought in this action, reduced only by any

Supplemental Findings of Fact
and Conclusions of Law - 26

amounts it has subsequently recovered.  In my earlier decision, I found that IE owed Rapid $282,516.46, and that Rapid had recovered $14,220.19.  For the reasons set out above, defendant Gorder is liable for his failure to take the required steps as a corporate director in liquidating IE, and certain of his transactions with the corporation must be recharacterized as set out in this decision.  Based upon the supplemental Findings of Fact and Conclusions of Law, Rapid is entitled to recover $268,296.27 from defendant Gorder. Interest shall run from February 17, 2004.

DATED this 20th day of June, 2007.

_____
John Jelderks
U.S. Magistrate Judge

Supplemental Findings of Fact
and Conclusions of Law - 27